AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

Sean Schoepflin,
   aka "Sean Fitzgerald,"
Erika Leon,
   aka "Erika Fitzgerald,"

     Defendants

```
LODGED
CLERK, U.S. DISTRICT COURT
3/15/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAM _____ DEPTUY
```

```
FILED
CLERK, U.S. DISTRICT COURT
3/15/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ bm _____ DEPUTY
```

Case No.   2:22-mj-01068-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about April 10, 2020, and on or about October 25, 2021, in the county of Los Angeles in the

Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.


Scott Bierwirth, Special Agent,
Federal Bureau of Investigation
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 15, 2022

*Judge's signature*

City and state:   Los Angeles, California     Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Scott Bierwirth, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrants against Sean Schoepflin (aka "Sean Fitzgerald") ("SCHOEPFLIN") and Erika Leon (aka "Erika Fitzgerald") ("LEON") for a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

2.     This affidavit is also made in support of applications for warrants to search: (1) 727 W. 7Th Street, Apartment 1425, Los Angeles, California 90017 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; (2) the person of SCHOEPFLIN, as described more fully in Attachment A-2; and (3) the person of LEON, as described more fully in Attachment A-3.

3.     The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1001 (False Statements), 1014 (Loan Application Fraud), and 371 (Conspiracy) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates are approximate.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with Federal Bureau of Investigation ("FBI").  I have been in this position since January 2018.  I am currently assigned to a counterterrorism squad, where I specialize in the investigation of domestic terrorism actors and groups.  I attended 21 weeks of new Agent training at the FBI Academy in Quantico, Virginia.  Prior to joining the FBI, I was an Infantry Officer in the United States Army, where I trained for counterterrorism related missions across the globe for over four years.  Through my training and experience in the FBI and the US Army, I am familiar with and have participated in white collar criminal investigations and fraud investigations, to include those related to domestic terrorism actors.  I have received formal and informal training from the FBI regarding computer-related investigations and computer technology.

## III. SUMMARY OF PROBABLE CAUSE

6.    As detailed below, between April 2020 and October 2021, SCHOEPFLIN and LEON made numerous false statements to the United States Small Business Administration ("SBA") to secure over $300,000 in Economic Injury Disaster Loans ("EIDLs") for their businesses, Capital Adventures Incorporated ("Capital

Adventures") and Lady Capital Incorporated ("Lady Capital"), and to attempt to secure additional EIDLs for Capital Adventures and Lady Capital, and their other businesses, Digital Army Limited Liability Corporation ("Digital Army"), and Lady Pictures Limited Liability Corporation ("Lady Pictures").

7.    SCHOEPFLIN and LEON used digital devices to send emails, place phone calls, and access Internet websites in furtherance of their fraudulent scheme, and submitted the fraudulent loan agreements from the residence where they lived prior to moving into the SUBJECT PREMISES.  SCHOEPFLIN and LEON now reside at the SUBJECT PREMISES, and there is probable cause to believe that evidence of their fraudulent scheme will be found on their persons and at their residence, including on physical files as well as digital devices on their persons and at their residence.

### IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Background on EIDLs**

9.    The SBA, through its Office of Disaster Assistance, provides financial assistance to businesses of all sizes, most private non-profit organizations, homeowners, and renters following a declared disaster.  In addition, SBA provides eligible small businesses necessary working capital to help overcome the economic injury of a declared disaster.  Section 7(b)(2) of the Small Business Act, as amended, authorizes the

SBA's Economic Injury Disaster Loan ("EIDL") Program.  SBA can make loans to eligible small businesses, eligible non-profit organizations, and eligible small agricultural cooperatives located in a disaster area that suffered substantial economic injury as a result of a disaster.

10.  On March 13, 2020, the President of the United States determined that the ongoing Coronavirus Disease 2019 (COVID-19) pandemic was of sufficient severity and magnitude to warrant an emergency determination under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act").  Consequently, SBA declared all states and territories eligible for EIDL assistance.  The SBA implemented a one-year deferment on EIDL loans provided due to COVID-19, automatic deferment of previous disaster loans for homeowners and businesses through 2020, and a six-month deferment on current SBA 7(a), 504, and Microloans.

11.  Small Businesses and non-profit organizations of any size affected by COVID-19 may apply for an EIDL if they meet one of the following requirements: (1) be any business with 500 or fewer employees that was in operation before February 1, 2020; (2) be a business with more than five hundred (500) employees that is considered small under SBA's size standards and was in operation before February 1, 2020; (3) be a sole proprietorship or independent contractor; or (4) be a private non-profit organization that is a non-governmental agency or entity that currently has an effective ruling letter from the Internal Revenue Service ("IRS") granting tax exemption under sections

501(c), (d), or (e) of the Internal Revenue Code of 1954, or has satisfactory evidence from the State that the non-revenue producing organization or entity is a non-profit one organized or doing business under State law, or is a faith-based organization.

12.  Eligible entities may qualify for loans up to $2 million with loan terms of up to thirty (30) years.  The interest rates are 3.75% for small businesses and 2.75% for non-profit organizations.  Proceeds may be used for working capital, including payroll costs, salaries and sick leave, rent and/or mortgage payments, material costs, and preexisting debt that could have been paid had the disaster not occurred.

13.  COVID-19 EIDL applicants are also eligible for an EIDL Advance of up to $10,000 that may be requested immediately. There is no requirement to repay the advance, even if the applicant is denied for an EIDL loan.  The EIDL advance can be used for working capital to meet ordinary and necessary financial obligations that cannot be met as a direct result of the disaster, including payroll costs, salaries, sick leave, rent and/or mortgage payments, material costs, and preexisting debt.

14.  Applications for COVID-19 EIDL loans and EIDL Advances are conducted through the SBA COVID-19 web portal and the SBA Rapid Decision System.  Applicants must submit a COVID-19 Rapid Intake Web Application, which is an Internet-based loan application.  SBA uses the information provided in the application to determine whether the applicant is eligible for

an EIDL and/or EIDL Advance.  Requested information includes
business legal name and trade name; employer identification
number or social security number for sole proprietorship;
organization type; business gross revenues from the previous
twelve (12) months prior to the date of the disaster; business
costs of goods sold from the previous twelve (12) months prior
to the date of the disaster; the business's number of employees
as of January 31, 2020; date of business establishment; date of
start of current ownership; business activity details; business
contact information and address; biographical information of
business owner(s); contact information and address of business
owner(s); and criminal history of business owner(s).

15.  SBA relies upon the self-certifications contained in
the application to verify that the applicant is an eligible
entity to receive the EIDL and/or EIDL Advance.  The self-
certification section reads:

16.  "CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing
this application, you [the applicant] certify that all
information in your application and submitted with your
application is true and correct to the best of your knowledge,
and that you will submit truthful information in the future."

17.  "WARNING: Whoever wrongfully misapplies the proceeds
of an SBA disaster loan shall be civilly liable to the
Administrator [of the SBA] in an amount equal to one-and-one
half times the original principal amount of the loan under 15
U.S.C. 636(b).  In addition, any false statement or
misrepresentation to the SBA may result in criminal, civil or

administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions."

18.   Loan approvals for COVID-19 EIDL loans are based on the applicant's gross revenues from the previous twelve (12) months, the business's costs of goods sold from the previous twelve (12) months, and the business's number of employees. Applicants must also meet the minimum credit score of 570.

19.   Approved EIDL loan amounts are based on a rough calculation of the applicant's net revenues over the past six (6) months.  The rough calculation takes the difference between the previous annual gross revenues and the previous annual costs of goods sold.  That number is divided by two (2) to determine the approved loan amount.

20.   EIDL Advance amounts are based on the business's reported number of employees as of January 31, 2020.  Applicants are permitted to receive a maximum EIDL Advance of $10,000.  In practice, SBA provides $1,000 in EIDL Advance funds for each employee on the applicant's payroll up to the maximum amount of $10,000.

**B.    April 2020: SCHOEPFLIN Made False Statements to Obtain a $156,000 EIDL for Capital Adventures**

21.   Nevada Secretary of State records show the following:

a.    Capital Adventures was incorporated on February 16, 2018, with an address of 2799 E. Tropicana Avenue, Suite H, Las Vegas, Nevada 89121 (the "Tropicana Address").  Online searches indicate 2799 E. Tropicana Avenue, Suite H, Las Vegas, NV 89121 was the location for "Legal Forms Nevada".  The proprietor is J.V.W. ("J.V.W."), with email address jake@legalformsnevada.com.  The website states "Registrant is not an attorney authorized to practice in this State and is prohibited from providing Legal advise [sic] or Legal representation to any person."

b.    From February 16, 2018 to April 8, 2020, the President, Secretary, Treasurer, and Director of Capital Adventures was listed as "Sean Fitzgerald."

c.    From April 8, 2020 to April 20, 2020, the President, Secretary, Treasurer, and Director of Capital Adventures were changed to "Sean Schoepflin."

d.    On April 20, 2020, the listed President, Secretary, Treasurer, and Director of Capital Adventures were changed back to "Sean Fitzgerald," which has remained the listed name since that time.

22.   According to California Secretary of State records, Capital Adventures was incorporated in California on May 26, 2020, with a Walnut, California commercial-mail-receiving-agency

address, and listed the Tropicana Address as its mailing
address.  "Sean Fitzgerald" was listed as the incorporator.

23.  Between December 2020 and February 2021, FBI Special
Agents interviewed multiple associates of SCHOEPFLIN, all of
whom knew him by the alias "Sean Fitzgerald."

24.  According to information SCHOEPFLIN provided to the
SBA, Capital Adventures provides business management and
development services.

25.  SBA records show the following:

a.  On April 10, 2020, an application was submitted
on behalf of Capital Adventures via the SBA's online portal for
an EIDL of $150,000.  SCHOEPFLIN's email address was listed as
the business email address.  According to records from the SBA
and Cox Communications, the Internet Protocol ("IP") address for
the computer from which Capital Adventures' application was
submitted to the online portal was registered to J.V.W.'s
company, Nevada Legal Forms, at the Tropicana Address.

b.  The application required the company
representative to provide his or her name and Social Security
Number.  On Capital Adventures' application, the listed name was
SCHOEPFLIN.  The listed Social Security Number was SCHOEPFLIN's,
with the second and third digits transposed ("549" instead of
"594").

c.  The address on the application was 20687 Amar
Road Suite 2, #818, Walnut, California 91789, which a basic
Internet search shows is the location of a UPS Store.  This is
the same address listed on the California incorporation

documents.  According to records provided by the UPS Store, SCHOEPFLIN leased Box 818 from April 8, 2020 to August 20, 2020.

d.    The application provided a bank account number for Capital Adventures, which was an account with Bank of America.

e.    The application required the applicant to check a box certifying under penalty of perjury that the information in the application was true and correct.  The application also included a warning that "any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to . . . fines and imprisonment, or both."

26.  According to SBA records, on June 25, 2020, the SBA emailed SCHOEPFLIN a loan authorization agreement for his signature.  On June 25, 2020, the SBA received a signed copy of the agreement bearing SCHOEPFLIN's digital signature.  The loan authorization agreement stated that "any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions, including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1040, 18 U.S.C.3571, and any other applicable laws" and "under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency."  IP records show that the signed loan authorization agreement was submitted to the SBA from 24151 High Knob Road #C, Diamond Bar, California 91765 (the

"Diamond Bar Residence"), which public records and agent surveillance confirm was SCHOEPFLIN and LEON's residence until June, 2021.

27.  According to SBA records, on June 25, 2020, the SBA provided Capital Adventures an EIDL of $149,900 (reflecting the $150,000 EIDL minus a $100 filing fee).  On July 7, 2020, the SBA provided an additional $6,000 as an EIDL advance, which consisted of $1,000 for each of the six employees claimed by Capital Adventures on its EIDL application.

28.  As detailed below, based on my review of the EIDL application, as well as bank records, law enforcement databases, Google records, and information provided by other law enforcement officers, SCHOEPFLIN appears to have made at least four false statements in connection with the EIDL application.

        1.    <u>False Statement One: Capital Adventures Had Six Employees</u>

29.  According to SBA records, SCHOEPFLIN stated on the EIDL application that Capital Adventures had six employees.

30.  Based on my and other agents' review of IRS records and records provided by the Nevada Development of Employment, Training, and Rehabilitation and the California Employment Development Department, none of those entities has any records indicating that Capital Adventures has ever had any listed employees, paid any payroll taxes, or filed any documentation such as W-2 forms indicating that it had any employees.

31.  According to a Special Agent from the Treasury Office of Inspector General for Tax Administration, there is no record

of Capital Adventures filing any tax information until August 2021, when it submitted a Form 1065 for the year 2019 after its request for an EIDL increase was denied, as discussed below.  No records indicative of wages paid to employees of Capital Adventures, such as W-2, 1099-MISC or 1099-R forms, were found to exist.  Additionally, there were no Forms 940 (Employer's Annual Federal Unemployment Tax Return) or 941 (Employer's Federal Quarterly Tax Return) on file for Capital Adventures. Employers file these forms annually and quarterly, respectively, prior to filing an annual tax return to make an estimated tax payment to the IRS.

32.  As set forth below, records provided by Wells Fargo and Bank of America for Capital Adventures' bank accounts do not show withdrawals of any significant amount or on a consistent basis that would indicate either account was used to pay employee salaries.

a.  Capital Adventures maintained a bank account with Wells Fargo from February 16, 2018 to January 18, 2019.  During the 11 months when that Wells Fargo account was active, it had total cash deposits of $35,008.74.  When the account closed in January 2019, it had a negative balance of $33.23.

b.  I and other FBI special agents reviewed credit reports, bank records, and other public databases for SCHOEPFLIN and Capital Adventures and were unable to identify any bank account for Capital Adventures from January 18, 2019 to April 8, 2020.

12

        c.   On April 8, 2020, two days before SCHOEPFLIN submitted the EIDL application, Capital Adventures opened a bank account with Bank of America with a $100 initial deposit.

        2.   <u>False Statement Two: Capital Adventures Had $560,000 in Revenue in 2019</u>

33.  According to SBA records, in Capital Adventures' EIDL application, SCHOEPFLIN stated that Capital Adventures had revenues of $560,000 in the 12-month period of February 1, 2019 to January 31, 2020.

34.  According to SBA records, on June 18, 2020, an SBA employee sent an email to SCHOEPFLIN requesting Capital Adventures' business tax return to show proof of Capital Adventures' existence as a business entity.

35.  According to Google records, shortly after receiving the email, SCHOEPFLIN sent an email to J.V.W.  SCHOEPFLIN later sent an email to the SBA stating that he planned to meet with his accountant the next day.  The next day, SBA records show that SCHOEPFLIN sent the SBA an unsigned IRS Form 1120, U.S. Corporation Income Tax Return, for 2019.  The tax form stated that Capital Adventures had gross sales or receipts of $625,112 in 2019.

36.  According to a Special Agent from the United States Treasury Inspector General for Tax Administration, Capital Adventures did not file an IRS Form 1120 for 2019 until July 2021, after it requested and was denied an increase of its EIDL, as discussed below.

37.   Furthermore, as discussed above, Capital Adventures'
bank accounts do not show deposits or any form of financial
activity consistent with the receipt of $560,000 or $625,112 in
revenue in 2019.  Instead, between February 2018 and April 2020,
Capital Adventures' bank accounts had total deposits of
approximately $35,000.

### 3.   False Statement Three: SCHOEPFLIN Had No Prior Criminal Convictions

38.   According to SBA records, on Capital Adventures' EIDL
application, SCHOEPFLIN answered "No" to the following question:
"For any criminal offense - other than a minor vehicle violation
- have you ever been convicted, plead guilty, plead nolo
contendere, been placed on pretrial diversion, or been placed on
any form of parole or probation (including probation before
judgment)?"

39.   According to law enforcement databases, SCHOEPFLIN has
sustained two felony convictions: (1) In January 2005,
SCHOEPFLIN was convicted in the State of Texas of possession of
a controlled substance and sentenced to 10 years' probation and
a fine of $25,000; and (2) in November 1998, SCHOEPFLIN was
convicted in the State of Florida of burglary and sentenced to
one year and six months' imprisonment.

### 4.   False Statement Four: Capital Adventures Would Use the EIDL for Working Capital

40.   According to SBA records, on June 25, 2020, SCHOEPFLIN
signed a Loan Authorization and Agreement on behalf of Capital
Adventures, stating that "Borrower will use all the proceeds of
this Loan solely as working capital to alleviate economic injury

caused by disaster occurring in the month of January 31, 2020 and continuing thereafter."

41.  According to Bank of America records provided through May 31, 2021, after receiving the EIDL, Capital Adventures did not spend all of the EIDL funds on expenses related to the operations of Capital Adventures.  As noted above, Capital Adventures opened a bank account with Bank of America on April 8, 2020, with a $100 initial deposit.  Before receiving the EIDL funds, Capital Adventures' Bank of America account had a balance of $47.01.

42.  After receiving the EIDL funds, according to Bank of America records provided through October 30, 2020, Capital Adventures did not appear to spend money on payroll expenses.

43.  Between September 16, 2020 and May 31, 2021, Capital Adventures transferred $9,140 to a Venmo account for "Sean Fitzgerald," made numerous purchases of gasoline and food, and made wire transfers totaling $120,500 to LEON's company, Lady Capital.  As of May 31, 2021, the account had $186 remaining.

**C.   April 2020: LEON Made False Statements to Obtain a $154,000 EIDL for Lady Capital**

44.  According to multiple witnesses interviewed by FBI Special Agents, LEON is SCHOEPFLIN's girlfriend and lives with SCHOEPFLIN at the SUBJECT PREMISES.

45.  Nevada Secretary of State records show the following:

a.   Lady Capital was incorporated in Nevada on August 24, 2019 with the Tropicana Address listed as the mailing address.  According to records provided by Google, on August 21,

2019, SCHOEPFLIN directed J.V.W. to set up the corporation for LEON.

b.   From September 16, 2019, to August 31, 2020, LEON was listed as the President, Secretary, Treasurer, and Director of Lady Capital.

c.   On August 31, 2020, LEON was replaced in those positions by "Erika Fitzgerald," which I believe to be an alias for LEON.

46.   According to SBA records, on its EIDL application, Lady Capital stated that it was in the "Business Services" industry.

47.   According to California Secretary of State records, Lady Capital was incorporated in California on June 1, 2020, by "Erika Fitzgerald."  The listed address was 20687 Amar Road, Suite 2, #818, Walnut, California 91789, which is the same UPS box that SCHOEPFLIN leased and listed on Capital Adventures' Loan Application, as discussed in paragraph 25(c) above.

48.   SBA records show the following:

a.   On April 8, 2020, an application was submitted on behalf of Lady Capital via the SBA's online portal for an EIDL of $150,000.  LEON's email account was listed on the application as the business email address.  According to records from the SBA and Cox Communications, the IP address for the computer from which Lady Capital's application was submitted to the online portal was registered to J.V.W.'s company, Nevada Legal Forms, at the Tropicana Address.

b.    The application required the company representative to provide his or her name and Social Security Number.  On Lady Capital's application, the listed name was LEON.  The listed Social Security Number was LEON's.

c.    The address on the application was nearly identical to the Diamond Bar Residence, except that it contains an extra "5" at the end of the street address (the actual street address is "24151" whereas the street address listed in the application is "241515").

d.    The application listed a bank account number for Lady Capital for an account with JP Morgan Chase bank (the "Chase Account").

e.    The application required the applicant to check a box certifying under penalty of perjury that the information in the application was true and correct.  The application also included a warning that "any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to . . . fines and imprisonment, or both."

49.  According to SBA records, on June 17, 2020, SBA emailed LEON a loan authorization agreement for her signature. On June 18, 2020, SBA received a signed copy of the agreement bearing LEON's digital signature.  The loan authorization agreement stated ". . . any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions, including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1040, 18

U.S.C.3571, and any other applicable laws . . ." and "under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency."  IP records show that the signed loan authorization agreement was submitted to the SBA from the Diamond Bar Residence.

50.  According to SBA records, on May 1, 2020, the SBA granted Lady Capital's application and provided an EIDL advance of $4,000, which consisted of $1,000 for each of the four employees claimed by Lady Capital on its EIDL application.  On June 22, 2020, the SBA provided Lady Capital a loan of $149,900 (reflecting the $150,000 EIDL minus a $100 filing fee).

51.  As detailed below, based on my review of the EIDL application, as well as bank records, Google records, and information provided by other law enforcement officers, LEON appears to have made at least three false statements in connection with the EIDL application.

1.    False Statement One: Lady Capital Had Four Employees

52.  According to SBA records, LEON stated on the EIDL application that Lady Capital had four employees.

53.  Based on my and other agents' review of IRS records and records provided by the Nevada Development of Employment, Training, and Rehabilitation and the California Employment Development Department, none of those entities has any records indicating that Lady Capital has ever had any listed employees,

paid any payroll taxes, or filed any documentation such as W-2
forms indicating that it had any employees.

54.   According to a Special Agent from the Treasury Office
of Inspector General for Tax Administration, there is no record
of Lady Capital filing any tax information until August 2021,
when it submitted a Form 1065 for the year 2019 after its
request for an EIDL increase was denied, as discussed below.  No
records indicative of wages paid to employees of Lady Capital,
such as W-2, 1099-MISC or 1099-R forms, were found to exist.
Additionally, there were no Forms 940 (Employer's Annual Federal
Unemployment Tax Return) or 941 (Employer's Federal Quarterly
Tax Return) on file for Lady Capital.  As noted above, employers
file these forms annually and quarterly, respectively, prior to
filing an annual tax return to make an estimated tax payment to
the IRS.

55.  JP Morgan Chase records for Lady Capital's bank
account do not show withdrawals of any significant amount or on
a consistent basis that would indicate it was used to pay
employee salaries.

a.   As noted above, Lady Capital was first
incorporated in Nevada on August 24, 2019.  JP Morgan Chase
records show Lady Capital opened a business bank account with JP
Morgan Chase bank on September 14, 2019 (the Chase Account).
The Chase Account was opened with a deposit of $1,500 and
received an initial bonus for opening a new checking account.
After that, between September 2019 and April 2020, the Chase
Account did not receive any deposits.

b.   Between May 2020 and July 2020, the only deposits into the Chase Account were the EIDL and EIDL advance, as well as ~~the~~ _a_ $64,000 transfer that SCHOEPFLIN made from the Capital Adventures account~~, as discussed in paragraph 32(e) above~~.  The Chase Account did not show withdrawals of any significant amount or on a consistent basis that would indicate that it was used to pay employee salaries.



56.   Navy Federal Credit Union records show the following:

a.   In May 2021, LEON opened a business account for Lady Capital as well as a personal account with Navy Federal Credit Union.

b.   Between May 2021 and September 2021, the business account received $49,500 in transfers from Capital Adventures, $75,500 in deposits from a medical firm for which LEON worked as an employee, refunds of $154, a transfer from her personal account, and dividends.  There was no other income.  The business account did not show withdrawals of any significant amount or on a consistent basis that would indicate that it was used to pay employee salaries.

57.   I also reviewed records from LEON's separate personal bank accounts and did not identify any deposits or expenses that appear to be related to Lady Capital.

2.   <u>False Statement Two: Lady Capital Had $485,000 in Revenue From January 31, 2019 to January 31, 2020</u>

58.   According to SBA records, in Lady Capital's EIDL application, LEON stated that Lady Capital had revenues in the

12-month period of February 1, 2019 to January 31, 2020 of
$485,000.

59.  As discussed above, Lady Capital's bank account does
not show deposits or any form of financial activity consistent
with the receipt of $485,000 in revenue in 2019.  On the
contrary, Lady Capital's account was opened in September 2019
with a deposit of $1,500 and received no additional deposits
between September 2019 and April 2020.

        3.   <u>False Statement Three: Lady Capital Would Use the</u>
           <u>EIDL for Working Capital</u>

60.  According to SBA records, on June 17, 2020, LEON
signed a Loan Authorization and Agreement on behalf of Lady
Capital stating that "Borrower will use all the proceeds of this
Loan solely as working capital to alleviate economic injury
caused by disaster occurring in the month of January 31, 2020
and continuing thereafter."

61.  As noted above, in addition to receiving the EIDL
funds, Lady Capital also received $125,500 from Capital
Adventures between September 2020 and May 2021.  Between October
2020 and April 2021, LEON also received $35,000 from a medical
firm into the Chase Account (Lady Capital's business bank
account).  According to California EDD records, LEON was
employed by that medical firm throughout that time period.

62.  According to Chase bank records for Lady Capital
provided through December 1, 2020, Lady Capital did not spend
all the EIDL funds on expenses related to the operations of Lady
Capital.

a.   In August 2020, LEON used the Chase Account to
pay off a personal credit card bill in August 2020 in the amount
of $11,471.85, which was a balance that the credit card had
accumulated over multiple years, including before Lady Capital
was incorporated in February 2019, from what appear to be
various personal expenses such as food, gas, and other retail
expenses.

b.   Between June 2020 and April 2021, LEON used the
Chase Account to make thousands of dollars of purchases at gas
stations, car washes, restaurants, and convenience stores.  LEON
also used the Chase Account to spend money on travel expenses
and various retail items such as clothing, cameras, tactical
gear such as ballistic helmets, and ammunition.

c.   In July and August 2020, Lady Capital made
approximately $20,000 in payments from the Chase Account to a
law firm which, according to U.S. Patent and Trademark Office,
filed trademark requests on behalf of Lady Capital for multiple
entities, with Lady Capital listed as the applicant.  The
trademark applications were for, among other things, Lady
Pictures, Capital Adventures, and Digital Army.

d.   Finally, between June 2020 and April 2021, LEON
withdrew over $126,500 in cash.

**D.   February 2021: SCHOEPFLIN Made False Statements to
Apply for a $150,000 EIDL for Digital Army**

63.  Nevada Secretary of State records show the following:

a.   Digital Army was incorporated on September 23,
2020, listing the Tropicana Address as the mailing address.

b.    The "For God and Country Trust" was listed as the Manager until February 2, 2021 (the date of the EIDL Loan application), when SCHOEPFLIN was listed as the Manager.  On August 10, 2021, the Manager was changed to "Sean Fitzgerald."

c.    The registered agent is Nevada State Filing Services LLC, which is run by J.V.W.

d.    The address listed is 3419 Via Lido, Newport Beach, CA 92663, which is the same address, minus the apartment number, that SCHOEPFLIN provided to Beverly Hills police officers as his residential address when he was stopped for a traffic violation in October 2020.  The address is a known commercial-mail-receiving agency, where SCHOEPFLIN rented a Post Office box.

64.  California Secretary of State records show Digital Army was incorporated in California on October 2, 2020.

65.  Digital Army's website describes the company as "a group of 'digital soldiers' . . . [i]nspired by messages published by online truth-seekers . . . Furthermore, we have worked alongside the great awakening developing 15+ brands . . . Ownership of all brands will be chosen from our community of digital soldiers."  The website features imagery including bullet holes in logos of large mainstream media and other corporations.

66.  SBA records show the following:

a.    On February 2, 2021, an application was submitted on behalf of Digital Army via the SBA's online portal for an EIDL of $150,000.  The listed business email address was

Digitalarmy702@gmail.com, which Google records show was created that same day, and was registered to SCHOEPFLIN and linked to SCHOEPFLIN's Capital Adventures email account.  According to Cox Communications, the IP address for the computer from which Digital Army's application was submitted to the online portal was registered to J.V.W.'s company, Nevada Legal Forms, at the Tropicana Address.

      b.   The application required the company representative to provide his or her name and Social Security Number.  On Digital Army's application, the listed name was SEAN SCHOEPFLIN II and the listed Social Security Number was SCHOEPFLIN's Social Security Number.

      c.   The address listed on the application was the street address for the Tropicana Address, but listed Suite G instead of Suite H.  SCHOEFPLIN also listed his "residential street address" as the Newport Beach commercial-mail-receiving agency described above.

      d.   The application listed a bank account number for Digital Army for an account with Bank of America.

      e.   The application required the applicant to check a box certifying under penalty of perjury that the information in the application was true and correct.  The application also included a warning that "any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to . . . fines and imprisonment, or both."

67.  As detailed below, based on my review of the EIDL application, as well as bank records, law enforcement databases, Google records, and information provided by other law enforcement officers, SCHOEPFLIN appears to have made at least three false statements in connection with the EIDL loan application for Digital Army.

1.   False Statement One: Digital Army Was
     Incorporated in February 2019

68.  According to SBA records, in Digital Army's EIDL application, SCHOEPFLIN stated that Digital Army was established on February 1, 2019.

69.  According to the SBA, to be eligible for an EIDL, a company was required to have been created prior to January 31, 2020.  As set forth above, Nevada Secretary of State records show that Digital Army was incorporated in September 2020.  Furthermore, according to the SBA, IRS records show that Digital Army did not file any tax return for 2019.

70.  Digital Army's EIDL application listed its bank account number with Bank of America.  According to records provided by Bank of America, Digital Army first opened that bank account on the date of the EIDL application February 2021 with a deposit of $100.  There was one deposit of $60 in May 2021, and a few minor withdrawals.  As of June 30, 2021, the balance on the account was $42.06.  The FBI was unable to find evidence of any other accounts associated with Digital Army.

71.   On February 10, 2021, the SBA sent SCHOEPFLIN a letter
stating that the EIDL application was declined because the
"business started in 2020 and 2021 and is ineligible."

72.   On February 11, 2021, according to SBA records,
SCHOEPFLIN called the SBA and inquired about submitting a
request to the SBA to reconsider the application.  The SBA
representative provided SCHOEPFLIN an email address to which he
could submit a reconsideration request and advised SCHOEPFLIN to
provide new information and documentation to overcome the
declination, including a signed and scanned IRS 4506-T, Disaster
Request for Transcript of Tax Return.  The IRS form 4506-T is a
form authorizing the SBA to request tax returns from years
authorized.  By providing that form to the SBA, SCHOEPFLIN
authorized the SBA to seek returns filed by Digital Army.
According to the SBA, the IRS reported that it did not find tax
returns for Digital Army for 2018 or 2019.

73.   In March 2021, SBA processed SCHOEPFLIN's request for
reconsideration of the EIDL for Digital Army, which included
supporting documentation such as a 2019 Form 1120S, a scanned
copy of SCHOEPFLIN's driver's license, an unsigned IRS Form 1065
Return of Partnership Income, an SBA Form 2202-Schedule of
Liabilities, and an IRS Form 4506T that allowed the SBA to
request tax documentation from the IRS.  The unsigned Form 1065
listed an incorrect Employer Identification Number ("EIN") (86-
1285049 instead of 1825049), stated that Digital Army was formed
on January 10, 2019 (not the February 1, 2019 date listed on the

application), and stated that it had $535,136 in gross receipts or sales in 2019.

74.   According to Google records, the unsigned 2019 IRS Form 1065 was not created until on or after February 12, 2021, when J.V.W. provided a tax preparer the information used to populate the form.

75.   In May 2021, according to SBA records, after the SBA informed SCHOEPFLIN that it had been unable to obtain from the IRS any tax returns filed by Digital Army, SCHOEPFLIN replied that his accountant had inadvertently flipped two numbers on the EIN, and SCHOEPFLIN submitted to the SBA a corrected (unsigned) tax return containing the correct EIN.  The SBA again sought to obtain IRS records associated with the revised EIN and again received a response from the IRS that no return had been filed with the IRS under that EIN.

> 2.   False Statement Two: Digital Army Had Six Employees

76.   According to SBA records, SCHOEPFLIN stated on the EIDL application that Digital Army had six employees as of January 31, 2020.

77.   Based on my and other agents' review of IRS records and records provided by the Nevada Development of Employment, Training, and Rehabilitation and the California Employment Development Department, none of those entities has any records indicating that Digital Army has ever had any listed employees, paid any payroll taxes, or filed any documentation such as W-2 forms indicating that it had any employees.

78.   Furthermore, as noted above, based on my review of records provided by Bank of America, Digital Army's bank account was not created until February 2021.  Accordingly, no bank records exist documenting payment of any expenditures, such as employee salaries, for 2019 (or any other year).

          3.   <u>False Statement Three: Digital Army Had $535,156 in Sales in 2019</u>

79.   According to SBA records, in Digital Army's EIDL application, SCHOEPFLIN stated that Digital Army had revenues of $535,000 in the 12-month period of February 1, 2019 to January 31, 2020.

80.   On March 15, 2021, as set forth above, SCHOEPFLIN sent the SBA an unsigned 2019 IRS Form 1065 for Digital Army.  That form stated that Digital Army had gross sales in 2019 of $535,156.

81.   As noted above, Bank of America records show Digital Army's bank account was not created until February 2021.  From February until June 30, 2021, there was one deposit of $60 and withdrawals from gas stations and local markets.  FBI agents were unable to find any bank records documenting any bank accounts or revenues for Digital Army in 2019 (or any other year).

**E.   February 2021: LEON Made False Statements to Apply for an EIDL for Lady Pictures**

82.   Nevada Secretary of State records show the following:

          a.   Lady Pictures was incorporated on July 8, 2020. The listed address was the Tropicana Address with Suite G instead of Suite H.

b.   LEON was listed as the Manager.   No other names were listed in the incorporation documentation.

83.   According to California Secretary of State records, Lady Pictures has never been incorporated in California.

84.   Chase records show Lady Pictures opened a bank account on January 11, 2021 with a deposit of $100.   The bank account received no deposits before being closed in February 2021.

85.   FBI special agents also reviewed Bank of America records associated with Lady Pictures.   On March 12, 2021, a Bank of America account was opened for Lady Pictures with a deposit of $100.   The only activity on the account was service fees of $16/month beginning in June 2021.   As of January 31, 2022, the account had a negative balance of $28.00.

86.   FBI agents were unable to find any bank records documenting any other bank accounts or revenues for Lady Pictures in 2019 (or any other year).

87.   SBA records show the following:

a.   On February 17, 2021, an application was submitted on behalf of Lady Pictures via the SBA's online portal for an EIDL of $150,000.   The listed business email address was Ladypicturesceo@gmail.com, which Google records show was created that same day and is registered to LEON.   According to records from the SBA and Cox Communications, the IP address for the computer from which Lady Pictures' application was submitted to the online portal was registered to J.V.W.'s company, Nevada Legal Forms, at the Tropicana Address.

b.   The application required the company representative to provide his or her name and Social Security Number.  On Lady Pictures' application, the listed name was LEON and the listed Social Security Number was LEON's.

c.   The address listed on the application was the Tropicana Address, with Suite G instead of Suite H.  LEON's residential street address was listed as the Tropicana Address, also with Suite G instead of Suite H.

d.   The application listed a bank account number for Lady Pictures for a bank account with JP Morgan Chase bank.

e.   The application required the applicant to check a box certifying under penalty of perjury that the information in the application was true and correct.  The application also included a warning that "any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to . . . fines and imprisonment, or both."

88.  As detailed below, based on my review of the EIDL application, as well as bank records, law enforcement databases, Google records, and information provided by other law enforcement officers, LEON appears to have made at least three false statements in connection with the EIDL loan application for Lady Pictures.

      1.   <u>False Statement One: Lady Pictures Was Incorporated in February 2019</u>

89.  According to SBA records, in Lady Pictures' EIDL application, LEON stated that Lady Pictures was established on April 1, 2019.

90.  As stated above, according to the SBA, to be eligible for an EIDL, a company was required to have been created prior to January 31, 2020.  Because Nevada Secretary of State records showed that Lady Pictures was formed in July 2020, on February 18, 2021, according to SBA records, the SBA informed LEON via telephone that the EIDL application for Lady Pictures would be denied, and that if LEON wanted the SBA to reconsider the application, she could submit a letter of reconsideration.

91.  According to Google records, on February 19, 2021, J.V.W. sent an email to SCHOEPFLIN directing him to email "Tina" a list of financial numbers, to include "Total Income generated" of $402,366.00.  SCHOEPFLIN forwarded the email to his tax preparer, A.M., on February 26, 2021.  A.M. responded the same day with an IRS Form 1065 for Lady Pictures, listing the date the business started as February 1, 2019 (not the April 1, 2019 date listed on the application) and gross receipts for 2019 of $402,366.

92.  On February 26, 2021, LEON submitted a request to SBA for reconsideration.  In support of that request, in March 2021, LEON emailed the SBA an SBA Form 2202 – Schedule of Liabilities, and the unsigned IRS Form 1065 for Lady Pictures for 2019 that J.V.W. and A.M. prepared for her in February 2021.  The IRS form

stated that Lady Pictures was formed on February 1, 2019 and had gross receipts for 2019 of $402,366.  LEON also provided the SBA an IRS Form 4506-T for Lady Pictures for tax years 2017, 2018, and 2019.

93.  According to the SBA, the SBA requested tax records from the IRS and the RIS responded that it had no record of Lady Pictures filing the Form 1065 or any other tax returns for any year.

94.  According to the SBA, on March 30, 2021, the SBA sent LEON a declination letter to the reconsideration request, stating, "[d]uring the loan underwriting process there were one or more items that were reviewed that caused the SBA to question the validity of certain information you submitted as part of your application."

    2.   False Statement Two: Lady Pictures Had Six Employees

95.  According to SBA records, LEON stated on the EIDL application that Lady Pictures had six employees as of January 31, 2020.

96.  Based on my and other agents' review of IRS records and records provided by the Nevada Development of Employment, Training, and Rehabilitation and the California Employment Development Department, none of those entities has any records indicating that Lady Pictures has ever had any listed employees, paid any payroll taxes, or filed any documentation such as W-2 forms indicating that it had any employees.

97.  Furthermore, as noted above, based on my review of bank records, Lady Pictures' bank account was not created until January 2021.  Accordingly, no bank records exist documenting payment of any expenditures, such as employee salaries, for 2019 (or any other year).

       3.   <u>False Statement Three: Lady Capital Had $436,200 in Revenue</u>

98.  According to SBA records, in Lady Pictures' EIDL application, LEON stated that Lady Pictures had $436,200 in gross revenue in the 12-month period of February 1, 2019 to January 31, 2020.

99.  On March 17, 2021, as set forth above, LEON sent the SBA an unsigned 2019 IRS Form 1065 for Lady Pictures.  That form stated that Lady Pictures had gross sales in 2019 of $402,366.

100. As set forth above, however, Lady Pictures was first incorporated in July 2020, first opened a bank account in January 2021 with a deposit of $100, filed no tax forms for the year 2019, and does not appear to have had any bank accounts, operations, or revenues in 2019.

    **F.**    **April-October 2021: SCHOEPFLIN Made False Statements to Apply for a $350,000 EIDL Increase for Capital Adventures**

101. According to SBA records, on April 7, 2021, SCHOEPFLIN sent an email to the SBA requesting an increase in Capital Adventures' EIDL from $150,000 to $500,000.

102. On April 22, 2021, SBA records show that SCHOEPFLIN provided the SBA an IRS Form 4506-T, Disaster Request for

Transcript of Tax Return for Capital Adventures for tax years 2018 and 2019 to support his request for an increased EIDL.

103. According to the SBA, the IRS responded that Capital Adventures did not file taxes at all in 2018 or 2019.  On June 23, 2021, the IRS reported to the SBA that for tax years 2018 and 2019, the IRS had "No record of return filed" for Capital Adventures.

104. On July 2, 2021, the SBA sent a letter to SCHOEPFLIN, stating "there were one or more items that were reviewed that caused the SBA to question the validity of certain information you submitted as part of your application."

105. According to the SBA, on October 1, 2021, SCHOEFPLIN contacted the SBA to request reconsideration of the declined increased request.  Shortly thereafter, SCHOEPFLIN also sent in a signed Form 1120 for 2019, stamped by the IRS on July 30, 2021.  The IRS form appears to contain the same information as the unsigned Form 1120 that SCHOEPFLIN submitted in June 2020, as discussed above.  The IRS form stated, among other things, that Capital Adventures revenues in 2019 were $625,112.  As set forth above, however, bank records show that between February 2018 and April 2020, Capital Adventures' bank accounts had total deposits of only approximately $35,000.

106. On November 1, 2021, SCHOEPFLIN again contacted the SBA via email, stating, "I would like to request a reconsideration for loan increase.  Additionally, we were informed we may qualify for an increase up to $2,000,000.  If

that is accurate information, we would like to apply for that
increase and sincerely appreciate its offer . . . ."

### G.    April-October 2021: LEON Made False Statements to Apply for a $350,000 EIDL Increase for Lady Capital

107. According to SBA records, on April 11, 2021, Lady
Capital submitted a request for an increase in its EIDL from
$150,000 to $500,000.

108. On July 2, 2021 the SBA declined the loan increase for
Lady Capital.  According to SBA records, the SBA declined the
loan increase after requesting information from IRS regarding
Lady Capital's tax filings, and receiving a response from the
IRS that it had no records of any tax returns filed by Lady
Capital.

109. On July 2, 2021, the SBA sent a declination letter for
the loan increase, stating, "[t]he SBA has been unable to verify
the existence of an eligible business as reflected in the
application.  The SBA has been unsuccessful in our attempts to
obtain documentation from multiple sources (public records) and
we attempted to obtain documentation from you that would
validate the existence of your business."

110. According to IRS records, in August 2021, Lady Capital
submitted an IRS Form 1120 for the year 2019.  In that form,
Lady Capital stated that it was incorporated on August 24, 2018,
and had gross receipts or sales in 2019 of $401,112.

111. According to SBA records, on October 25, 2021, LEON
submitted that Form 1120 to the SBA in support of her request
for an EIDL increase for Lady Capital.  As set forth above,

Nevada Secretary of State records show that Lady Capital was incorporated on August 24, 2019, not August 2018, and bank records show that Lady Capital's account was opened in September 2019 with a deposit of $1,500 and received no additional deposits between September 2019 and April 2020.

### H. January 2022: SCHOEPFLIN Acknowledged That He Submitted the EIDL Applications for Capital Adventures and Digital Army and Affirmed the Statements in Those Applications

112. On January 21, 2022, SCHOEPFLIN participated in a recorded phone call with an individual he believed to be a representative of the SBA, but who was in fact an undercover agent working for the FBI (the "UC"). During the call, SCHOEPFLIN confirmed that he was the person who completed the EIDL application for Capital Adventures in April 2020, who signed the loan authorization agreement in June 2020, and who requested the EIDL increase in April 2021. SCHOEPFLIN also said that the representations he made both on the original EIDL application and in requesting an EIDL increase, namely, that Capital Adventures had six employees and roughly $560,000 in revenues in 2019 and would use the EIDL for working capital, were accurate. SCHOEPFLIN also said that Capital Adventures had no other bank accounts beyond the Bank of America account listed on the original EIDL application. While answering questions regarding his EIDL application, SCHOEPFLIN also indicated that he was reviewing certain loan related documents in his possession at the time of the call. SCHOEPFLIN also told the UC that he was in the process of compiling reports concerning his

business's past activities, including those related to its inventory and assets.

113. During that call, SCHOEPFLIN also confirmed that he was the person who submitted the EIDL application for Digital Army in February 2021, and that the statements in that application were accurate.

114. On November 29, 2021, United States Magistrate Judge Karen L. Stevenson issued a warrant for cell-site location data for SCHOEPFLIN and LEON's phone numbers. Cell-site location data for SCHOEPFLIN's phone shows that it communicated with a cell phone tower in the area in which the SUBJECT PREMESIS is located during the call with the FBI UC.

**I. January 2022: LEON Acknowledged That She Submitted the EIDL Applications for Lady Capital and Lady Pictures and Affirmed the Statements in Those Applications**

115. On January 12, 2022, LEON participated in a recorded phone call with an individual she believed to be a representative of the SBA, but who was in fact the UC. At the time of the call, cell-site location data shows that LEON's cell phone communicated with a cell phone tower in the area in which the SUBJECT PREMESIS is located during the call.

116. During the call, LEON confirmed that she was the person who completed the EIDL application for Lady Capital in April 2020, who signed the loan authorization agreement in June 2020, and who requested the EIDL increase in April 2021. LEON said that no one else assisted her with her EIDL application. LEON said that the representations she made both on the original EIDL application and in requesting an EIDL increase, namely,

that Lady Capital had four employees and roughly $485,000 in revenues in 2019 and would use the EIDL for working capital, were accurate.  LEON also said that Lady Capital had used two bank accounts, the Chase Account and the Navy Federal Credit Union account, both of which are discussed above.  LEON did not identify any other bank accounts that Lady Capital had used.

117. LEON further said that since submitting the EIDL application in April 2020, Lady Capital had hired two additional employees in Nevada, and requested an EIDL increase to $2 million.

118. LEON similarly confirmed that she was the person who completed the EIDL application for Lady Pictures in February 2021.  LEON said that the representations she made in that application were accurate.

119. LEON further said that her residence continued to be the Diamond Bar residence listed in the EIDL application, even though she in fact had sold that house in approximately June 2021.  LEON expressed interest in reconsideration for the LADY PICTURES EIDL loan.  LEON confirmed that the statements in her EIDL application for LADY PICTURES were accurate.

**J.   Investigation of the SUBJECT PREMISES**

120. According to public Internet searches, LEON sold the Diamond Bar residence in June 2021.  According to Google records, leasing records, and an interview with the property manager, on June 26, 2021, Leon applied to rent the SUBJECT PREMESIS, with a move in date of July 1, 2021.

121. According to information provided by the property management company for the SUBJECT PREMISES, LEON provided that company with both her personal bank statements and statements from Lady Capital to verify her income, and stated that she had 100% ownership in the company.  On June 30, 2021, LEON signed the lease agreement, which is due to expire on September 29, 2022.  SCHOEPFLIN was not listed on the documents.

122. I and another FBI Special Agent interviewed multiple employees who work at the SUBJECT PREMISES, and they recognized SCHOEPFLIN from his California Department of Motor Vehicles photographs as the person who lived at the SUBJECT PREMISES along with LEON.

123. In October 2021, I and other FBI Special Agents encountered SCHOEPFLIN exiting the elevator on floor PH2, the floor where the SUBJECT PREMESIS is located.  According to the property manager, there is only one other apartment on the floor.

124. On November 29, 2021, United States Magistrate Judge Karen L. Stevenson issued a warrant for cell-site location data for the phone numbers that LEON and SCHOEPFLIN listed on their EIDL applications, which are the same phone numbers at which the FBI UC contacted LEON and SCHOEPFLIN in February 2022, as discussed above.  Cell-site location data for those phones shows that both phones have regularly communicated with cell phone towers in the area in which the SUBJECT PREMESIS is located, including during the calls with the FBI UC in January 2022, and regularly in the late evening and early morning hours, further

indicating that both LEON and SCHOEPFLIN are residing at the SUBJECT PREMISES and possess there the digital devices that they used in furtherance of the fraudulent schemes discussed herein.

125. According to Charter Communications, Lady Capital, with the email address LEON provided for the Lady Capital EIDL application, was the subscriber of the Internet service being provided at the SUBJECT PREMESIS.  The billing address was listed as the Newport Beach commercial mail receiving agency that SCHOEPFLIN listed on various documents, as noted above.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

126. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

41

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

127. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

128. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress SCHOEPFLIN's or LEON's thumb and/or
fingers on the device(s); and (2) hold the device(s) in front of
SCHOEPFLIN's or LEON's face with his or her eyes open to
activate the facial-, iris-, and/or retina-recognition feature.

43

## VI. <u>REQUEST FOR SEALING</u>

129. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications, including the application and the complaint and search warrant affidavit.  I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving SCHOEPFLIN and LEON who are unaware that they are being investigated.  In addition, some of their suspected criminal activity was facilitated by additional persons and businesses located in Nevada.  Disclosure of the complaint and search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## VII. <u>CONCLUSION</u>

130. For all of the reasons described above, there is probable cause to believe that SCHOEPFLIN and LEON have committed a violation of Title 18, United States Code, Section 1343 (Wire Fraud).  There is also probable cause that the items to be seized described in Attachment B will be found in a search

//

//

of the SUBJECT PREMISES described in Attachment A-1, and on the

person of SCHOEPFLIN and LEON as described in Attachments A-2

and A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  15th  day of
   March   , 2022.


_____
UNITED STATES MAGISTRATE JUDGE

45